

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

February 18, 2020

**BY ECF**

The Honorable Cathy Seibel
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

  Re: *United States* v. *Skylar Davis*, 17 Cr. 364 (CS)

Dear Judge Seibel:

  The Government respectfully submits this letter in advance of the sentencing in this matter, currently scheduled for February 24, 2020, for defendant Skylar Davis, a/k/a "S-Dot," for charges of racketeering, murder in connection with a drug crime, and murder through use of a firearm.

  Davis terrorized innocent civilians and rival gang members in Newburgh, fueling the lawless and deadly atmosphere that plagued the city. He was a proud member of the violent drug dealing street gang Southside. He committed or participated in at least seven shootings in the course of less than one year, from August 2015 to May 2016, only stopping when he was arrested on state drug and firearms charges. Early on in that period, he participated in the robbery and murder of Samuel Stubbs on August 13, 2015. As a result of these heinous crimes, he faces a mandatory minimum sentence of 25 years' imprisonment, and decades under the Sentencing Guidelines. The Government respectfully submits that a sentence of more than 30 years' imprisonment would appropriately serve the legitimate purposes of sentencing, particularly to reflect the seriousness of the offense, to protect the public from Davis' deadly violence, to deter Davis and others, and avoid unwarranted sentencing disparities.

**Background**

  This case arises out of an investigation by the Federal Bureau of Investigation ("FBI") and City of Newburgh Police Department ("CNPD") into gang and narcotics activity in Newburgh, New York. The investigation revealed that since at least 2014 a Newburgh street gang called Southside was engaged in racketeering activity, including acts of violence and the distribution of narcotics. Participation in criminal activity, particularly violence against other gang members, was important for elevating members' status and reputation within Southside. Southside's primary base of operations was the neighborhood surrounding the intersection of South and Liberty Streets in Newburgh. (*See* PSR ¶ 14).

The Honorable Cathy Seibel
February 18, 2020
Page 2 of 10

Southside members used violence, including shootings and robberies, to defend drug turf against rival gang members, including members of a rival Newburgh gang known as the Yellow Tape Money Gang ("YTMG"), which primarily operated in the vicinity of William and Hasbrouck Streets, about a mile south of Southside territory.  YTMG members were arrested in 2016 and charged in *United States v. Gayle, et al.*, 16 Cr. 361 (CS).  After the YTMG arrests, Southside continued its narcotics distribution and rivalry with other Newburgh gangs that were allied with YTMG, including gangs called "600" and "124."  (*See* PSR ¶ 15).

This Court knows the structure of Southside and YTMG well.  While leadership in Southside shifted over time, one thing did not change: Skylar Davis was the gang's most violent member, and he was respected for that violence.  He committed numerous violent acts as part of his membership in Southside.  Along with other members of Southside, Davis carried, brandished, and discharged firearms to defend Southside's drug turf and against other rival gang members. (*See* PSR ¶ 26).

Davis' most brutal act occurred on August 13, 2015.  Davis and other co-conspirators, including both members and non-members of Southside, agreed to rob a high-stakes card game taking place on Lander Street at which one of Davis' co-conspirators was losing money constituting proceeds from that person's drug dealing business.  Davis and two co-conspirators drove to the location of the card game.  Davis and another co-conspirator were both carrying firearms, and they approached the card game with their weapons drawn.  Samuel Stubbs, a Newburgh resident in his sixties with no gang affiliation, was seated at a card table on the sidewalk with two others.  Davis and his co-conspirator both fired their weapons, hitting all three card players.  Stubbs was killed by the gun fired by Davis's co-conspirator.  Davis' rounds struck the other players, who survived their injuries.  (*See* PSR ¶¶ 36-37).

Even after participating in a robbery and shooting that led to the death of an innocent victim, Davis continued participating in violent acts.  Among other shootings, Davis personally committed, aided and abetted, or caused each of the following non-fatal shootings, which promoted, enhanced, and protected Southside and its members:

- The attempted murder of YTMG member Gabriel Warren, a/k/a "Stacks," in the late summer or early fall of 2015 on William Street.  Davis, along with four other Southside members, traveled by car to YTMG territory, where, upon seeing a rival gang member, multiple Southside members discharged firearms.  Warren was not injured in the attack.  (*See* PSR ¶ 27).

- The attempted murder of YTMG member Armad Evans, a/k/a "Yellow," on or about October 5, 2015 near the intersection of Benkard Avenue and Little Monument Street.  Davis, along with four other Southside members, traveled by car to YTMG territory.  The driver of the vehicle was Southside member Delondre Rickett, a/k/a "Delzy."  Upon seeing rival gang members, multiple Southside

The Honorable Cathy Seibel
February 18, 2020
Page 3 of 10

members discharged firearms.    Evans was shot in both legs, requiring hospitalization to treat his injuries.  (*See* PSR ¶ 28).

- The attempted murder of YTMG member Tyrin Gayle, a/k/a "Spazzo," and other YTMG members on or about December 11, 2015.  Another Southside member drove Davis to the corner of William and Hasbrouck Streets in the heart of YTMG territory.  Davis fired out of the sunroof at YTMG members gathered on the corner, missing them, and the car returned to Southside territory.  YTMG members then drove to Southside territory to retaliate; Davis opened fire at the car, causing it to crash.  The three YTMG members were all injured in the crash.  (*See* PSR ¶ 30).

- The attempted murder of rival YTMG gang members on or about March 17, 2016.  On March 17, 2016, Southside members exchanged gunfire with YTMG members in the vicinity of William and Hasbrouck Streets in YTMG territory.  (*See* PSR ¶ 31).

- The attempted murder of rival gang member Romeo Herring on or about April 3, 2016.  Davis and other Southside members shot Herring, a member of the "124" gang that operated in the Heights area of Newburgh and was allied with YTMG.  Surveillance video, included here as Government Exhibit A[1] (the relevant portion begins at minute 56:00 of the video, at approximately 12:56 a.m.) shows Davis appearing to order the shooting, which was carried out by another Southside member.  Herring was struck in both legs and in one hand by bullets, requiring treatment at the hospital for his injuries.  (*See* PSR ¶ 32).

- The attempted murder of rival gang members in the vicinity of the 845 Lounge located at 778 Broadway in Newburgh, New York on or about May 21, 2016.  Davis, along with Southside member Demetrice McLean, a/k/a "Blocks," exchanged gunfire outside of the 845 Lounge with members of YTMG and allied gangs.  Davis, who was injured in the shoot-out, pled guilty in Orange County Court to criminal possession of a weapon in the second degree as a result of his participation in this shooting.  (*See* PSR ¶ 33).

As part of his leadership role within Southside, Davis helped to broker alliances between Southside and gangs in Poughkeepsie and Beacon, New York.  These gangs shared and traded firearms with each other, and at times helped each other with "drills," or shootings, targeting their respective rival gang members.  (*See* PSR ¶ 34).

Throughout 2015 and 2016, Davis also promoted Southside through social media posts on Facebook.  Through videos posted via Facebook's livestream feature, Facebook Live, Davis

---

[1]  Given their size, the Government is submitting along with its courtesy copy a drive with the relevant Government Exhibits, and creating an additional copy of the drive for defense counsel.

The Honorable Cathy Seibel
February 18, 2020
Page 4 of 10

posted videos in which he, among other things, taunted rival gang members, declared his own gang membership, brandished firearms, bragged about the money he made selling drugs, bragged about his own shootings, and threatened to send his "shooters" to shoot rivals. The Government is enclosing two examples of such videos posted by Davis to Facebook Live in 2016, both of which were downloaded from Facebook by the CNPD using an undercover account. The first video, submitted as Government Exhibit B, features approximately 13 minutes of Davis speaking extemporaneously to the camera. At various points in the video, Davis mocks YTMG member David Brown, a/k/a "Baby Thot," for not making money and for the scar on Brown's face, which resulted from the December 11, 2015 car crash. Davis also brags about the money he makes, declares that he has multiple guns, and explains that instead of committing "drive-bys" he prefers to walk up and shoot people. Near the end of the video, Davis shows other Southside members in the room and announces that he will tell his "shooters" what to do and then send them out to shoot opposing gang members. Notably, Davis also takes the time to explain that he is sober and plans to remain sober that night. Davis ends the video by saying, "when you see my face, you're gonna see sparks." The second video, submitted as Government Exhibit C, features similar statements by Davis, and is particularly notable because approximately 4 minutes and 25 seconds into the video, Davis and his co-defendant Calvin Lembhard brandish handguns at the camera.

During the same period as his affiliation with the Southside gang, Davis was engaged in a conspiracy with other members of Southside to sell drugs, namely 1 kilogram and more of heroin and 280 grams and more of crack. To enrich the members of the gang, Davis worked together with other Southside members to sell crack and heroin throughout the gang's territory on a daily basis. Davis was also convicted for three drug-related charges within a short time period, all for drug dealing within Southside territory, specifically: (i) an October 11, 2016 conviction for criminal possession of a controlled substance in the third degree, in violation of New York Penal Law § 220.16(01), for his possession with intent to sell heroin in the third-floor apartment of 295 Liberty Street on May 29, 2016; (ii) an October 11, 2016 conviction for criminal sale of a controlled substance in the third degree, in violation of New York Penal Law § 220.39(01) for his sale of cocaine to an undercover law enforcement officer in the vicinity of 119 South Street in Newburgh on November 6, 2015; and (iii) a September 29, 2015 conviction for criminal possession of a controlled substance in the third degree, in violation of New York Penal Law § 220.16(01), for his possession with intent to sell 154 decks of heroin on March 13, 2015 in the vicinity of South and Chambers Streets in Newburgh. As previously noted, Southside's acts of violence, including the numerous shootings committed by Davis himself, furthered its drug dealing by protecting territory, thus allowing Southside drug dealers to operate, and by promoting Southside's reputation for strength and violence, which deterred rival drug dealers from infringing on Southside turf, customers, and sources of supply or from attempting to rob Southside drug dealers. (*See* PSR ¶ 35).

## Procedural History

On June 14, 2017, the original Southside indictment was unsealed, charging Davis and other Southside members with various offenses, including racketeering conspiracy, narcotics conspiracy, attempted murder in aid of racketeering, and firearms possession and discharge. Other

The Honorable Cathy Seibel
February 18, 2020
Page 5 of 10

drug dealers who were not Southside members were also charged in the narcotics conspiracy. Davis was transferred from state custody on a federal writ and has been in federal custody ever since.  (*See* PSR at 2).

On January 29, 2018, a superseding indictment was filed, adding, among other charges, murder charges against Davis arising from the August 13, 2015 murder of Samuel Stubbs.  On or about September 12, 2018, the S4 Superseding Indictment, was filed.  On or about June 3, 2019, the defendant waived indictment, and pleaded guilty, to Superseding Information S7, charging racketeering conspiracy (Count One), murder in connection with a drug crime (Count Two), and a firearm offense based on the murder in connection with the drug crime (Count Three).[2]  (*See* PSR ¶¶ 1-4, 9).

### Guidelines Calculation

On June 3, 2019, Davis pled guilty pursuant to a plea agreement with the Government (the "Plea Agreement").  Both the Plea Agreement and Probation calculated Davis' total offense level as 42: the murder guideline of 43 for the murder of Samuel Stubbs, with two units added through grouping analysis for the seven additional attempted murders, including two resulting in serious bodily injury, and three points subtracted for acceptance of responsibility.  (*See* PSR ¶¶ 9, 46-98).

The parties agreed in the Plea Agreement that Davis has 16 criminal history points, resulting in a Criminal History Category of VI. (PSR ¶ 9).  By contrast, Probation determined that neither his November 2016 conviction for Criminal Possession of a Weapon nor his June 2009 conviction for Robbery receive criminal history points, resulting in 11 criminal history points. (PSR ¶¶ 99-107).  Regardless, Probation determined that Davis is a Career Offender and thus Criminal History Category VI.  (PSR ¶ 108).

As a result of these calculations, the parties and the PSR agree that the Guidelines Range is 360 months to life imprisonment, with a mandatory minimum term of 300 months' imprisonment, sixty months' of which must run consecutively to any other term of imprisonment. (PSR ¶ 148).  Probation recommends a sentence of 30 years' imprisonment.

### Applicable Law

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397

---

[2]  The underlying predicate for the firearms offense charged in Count Three is murder in connection with a drug crime in violation of Title 21, United States Code, Section 848(e). Murder remains a crime of violence, and thus a predicate for the 924(j) charge, after the Supreme Court's recent decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). *See, e.g.*, *United States v. Sierra*, 782 F. App'x 16, 20 (2d Cir. 2019) (holding that it is "self-evident" that murder "is a crime unmistakably involving" the "use of physical force.").

The Honorable Cathy Seibel
February 18, 2020
Page 6 of 10

F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in 18 U.S.C. § 3553(a)(2). To the extent a district court imposes a sentence outside the range recommended by the Guidelines, it must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

## The Court Should Impose a Sentence of More than 30 Years' Imprisonment

The Government respectfully submits that consideration of the Section 3553(a) factors weigh in favor of a sentence of more than 30 years.[3] In particular, the nature and circumstances of the offense, the need to protect the public, the need for both specific and general deterrence, the need to avoid unwarranted sentencing disparities, and the particular characteristics of this defendant all weigh in favor of a sentence well within the applicable Guidelines range, but less than life imprisonment.

*Seriousness of the Offense*

It is difficult to overstate the seriousness of this defendant's exceptionally violent offense conduct. As a leading figure in Southside, Davis is responsible for at least seven separate acts of violence, including the murder of an innocent robbery victim. Most serious of all, Davis participated as a shooter in the robbery and murder of Samuel Stubbs. Unlike most targets of Davis's violence, Stubbs was not a rival gang member or involved in Newburgh's gang violence. He was an innocent civilian who happened to be winning at cards in the early morning of August 13, 2015 and who unluckily found himself the target of an armed robbery. When Stubbs and his fellow card players failed to immediately turn over their cash, Davis and his co-conspirator opened fire. By shooting multiple times, Davis showed no consideration for Stubbs' life, or for the lives of the two men Davis himself shot.

Even after carrying out that senseless act of violence, resulting in the death of an innocent man, Davis remain undeterred from further shootings. Indeed, his subsequent actions make clear that the murder of Samuel Stubbs was no aberration. Davis participated in a panoply off additional

---

[3] The Government agrees with defense counsel and Probation that this sentence as to Counts One and Two should run concurrently with his undischarged term of imprisonment from his 2016 state conviction.

The Honorable Cathy Seibel
February 18, 2020
Page 7 of 10

shootings.  These include at least four drive-by shootings targeting YTMG members, one of which resulted in serious bodily injury to a rival gang member on October 5, 2015.  During one of those drive-by incidents, which took place in the middle of the day on December 11, 2015, Davis took the even more brazen step of raising himself through the open sunroof of a moving vehicle and opening fire aiming at a group of people on a sidewalk.

Beyond shooting from a car, and as he bragged on Facebook, Davis also participated in three non-fatal shootings while on foot.  First, when YTMG members drove through Southside territory on December 11, 2015 to exact revenge for Davis's drive-by shooting earlier that same day, Davis responded by shooting at the YTMG car.  Davis's shots caused the car to crash, injuring the YTMG members inside, and struck a storefront and parked car across the street, thereby endangering innocent bystanders in the middle of the afternoon.  Second, on April 3, 2016 Davis personally directed another Southside member to shoot at rival gang member Romeo Herring.  The other Southside member followed Davis's instructions and shot Herring in both legs and in the hand.  Third, on May 21, 2016, Davis and another Southside member engaged in a shootout with rival gang members outside of a club, again endangering innocent bystanders.  All of these shootings took place after Davis had already participated in the murder of an innocent man.  This continued pattern of conduct reflects an utter disregard for human life and warrants a sentence within the Guidelines range.

As demonstrated by the sheer volume of shootings for which he is responsible, Davis was one of the most dangerous members of Southside.  Even as one of the youngest members of the gang, he was by himself a one-man crime spree, always trigger-happy to shoot at or direct violence against gang rivals, thus earning the respect of his fellow gang members.  Indeed, Davis was a leader of Southside, feared and respected for his acts of deadly violence.  His brutality contributed to Southside's reputation for violence and helped escalate the senseless rivalry between Southside and YTMG, which made Newburgh feel like a war zone to its residents for months.

During the periods between shootings, Davis continued participating in the other affairs of the Southside gang: dealing drugs.  He and his fellow gang members regularly sold crack and heroin, contributing to the flow of addictive substances into their community.  In other words, Davis and his fellow gang members profited from the addictions of their neighbors.  When not selling drugs or carrying out violent acts, Davis took to Facebook to brag about his gang activities. He boasted of the shootings he committed, the money he made, the guns he had, and the shooters of Southside who would commit violent acts at his direction.  These videos demonstrate the glee with which Davis approached his criminal activities.  The defendant reveled in the violence he perpetrated.

Taken together, Davis's participation in a murder, at least seven attempted murders, and the distribution of significant quantities of crack and heroin, all while leading a gang, set him apart as the most dangerous defendant to be charged in either this case or the YTMG case.  The seriousness of his conduct merits a sentence above 30 years' imprisonment.

The Honorable Cathy Seibel
February 18, 2020
Page 8 of 10

*The Need to Protect the Public*

Davis's violent rampage through 2015 and 2016 reflect the tremendous danger he poses to the community. Davis participated in a murder and at least seven attempted murders with no regard whatsoever for the human lives he put at risk or the injuries he caused his victims. He committed these acts after already coming into contact with the criminal justice system, including 12 months in a reformatory, and multiple arrests. His decision to continue committing incredibly serious crimes demonstrates the need to incarcerate this defendant for a significant period of time in order to incapacitate him.

The Court can only protect the public—innocent men and women who live in Newburgh just like Samuel Stubbs did—by imposing a substantial sentence, namely one in excess of 30 years. In 30 years, Davis will be in his early 50s. Davis has given no reason for this Court to trust that at even that advanced age he will have learned his lesson and changed his violent ways. But at least for that lengthy period of time, the community will be protected from him.

*Specific and General Deterrence*

A Guidelines sentence is further needed to specifically deter this defendant from committing additional crimes when he is eventually released. Davis was arrested multiple times throughout his membership in Southside, for serious felony narcotics offenses, and was sentenced, as a juvenile, to a lengthy period of reformatory placement. Those arrests and that period of reform did nothing to deter him from his violent leadership of Southside. These arrests, and the associated periods of incarceration he was likely to face, appear to have been futile in deterring Davis. These circumstances thus cry out for a lengthy prison sentence to specifically deter this defendant from further crimes.

General deterrence is another important consideration in this case. The defendant's leadership of Southside and the havoc that gang wreaked was a major contributor to a spike in violent activity in a city plagued by violence. Conversely, the arrest of the defendant and his fellow gang members resulted in a meaningful downturn in violent crime in Newburgh. Imposing a lengthy sentence on the defendant would send a strong message to the community that violent crime in Newburgh will result not only in serious federal charges, but also significant consequences. It would also make clear that the plight of the majority of Newburgh's citizens – those like Samuel Stubbs who are law-abiding and non-violent – is taken seriously by the criminal justice system.

*The Need to Avoid Unwarranted Sentencing Disparities*

In seeking a sentence of more than 30 years, the Government is asking for a sentence longer than any this Court has imposed in either this case or the YTMG case. The Government has carefully considered the relative culpability of the defendants across both cases and believes that Davis's conduct is the most serious to come before this court. The Court has sentenced two other defendants who participated in a murder—Southside members Troy Young and William Fennell,

The Honorable Cathy Seibel
February 18, 2020
Page 9 of 10

who participated in the February 12, 2017 murder of a rival gang member—and one other gang leader who participated in numerous nonfatal shootings—Tyrin Gayle. The combination of Davis's participation in the murder of an innocent man, participation in numerous attempted murders thereafter, leadership position in Southside, and participation in the distribution of significant quantities of narcotics together warrants a sentence higher than those three defendants.

First, as the Court is aware, Young, who was sentenced to 15 years' imprisonment for his role as a shooter during the February 12, 2017 murder, was paralyzed during the same shootout that resulted in the murder to which he pled guilty. As a result, Young suffers from severe physical disabilities that make any term of incarceration particularly burdensome. Moreover, Young was not a leader within Southside, and he participated in fewer acts of violence than Davis. Second, Fennell, who participated in the incident that led to the February 12, 2017 murder but did not plead guilty to the murder itself, was sentenced to 20 years' imprisonment. Fennell did not act as a shooter in that incident, and also participated in far fewer acts of violence than Davis. Third, Gayle, who was sentenced to 30 years' imprisonment, was the leader of YTMG, engaged in obstructive conduct, and put the Government to its proof at trial. But Gayle did not participate in a murder; Davis did. The Court should impose a sentence to reflect that vast difference: the difference of the life of Samuel Stubbs, a sentence longer than it did upon Gayle.

*History and Characteristics of the Defendant*

Defense counsel writes movingly about Davis' childhood and his mental health and conditions. There is no question he was greatly disadvantaged. The Government does not dispute that the defendant experienced a deeply neglectful and dysfunctional childhood, as well as cognitive deficits, all of which led him down the path to associating with Southside at a very young age. Indeed, the Government took those factors into account when deciding to extend a plea offer instead of pursuing a VICAR murder charge and the resulting mandatory life sentence. The Government agrees that the mitigating factors eloquently highlighted by the defense warrant a sentence less than life imprisonment for this defendant. However, a sentence as low as that sought by the defense, especially any sentence below the Guidelines range, would not be appropriate in this case. Such a sentence would fail to adequately address the seriousness of this defendant's deadly violence.

Sadly, many defendants who come before this Court, including dozens from Newburgh, experience the kind of neglect and dysfunction described in the defense submission. Yet not all of those defendants turn to violence, and extremely few participate in a murder and then continue on a violent rampage resulting in seven additional attempted murders in the span of just a few months. The defendant's background cannot explain or excuse such egregious conduct. Indeed, there is no suggestion that the defendant's own brothers, who according to the defense submission also tested positive for lead poisoning and then also participated in gang and narcotics activity, were anywhere near as violent as he was. Unlike his brothers and his co-defendants, the defendant participated in numerous shootings that resulted in the death of an innocent victim, gunshot wounds to four victims, and terror throughout his community. That conduct demands a sentence within the Guidelines range.

The Honorable Cathy Seibel
February 18, 2020
Page 10 of 10

**<u>Conclusion</u>**

For the reasons set forth above, the Government respectfully submits that a sentence of more than 30 years, within the Guidelines range of 360 months' to life, would adequately balance the various considerations under §3553(a) and achieve the statute's stated objectives.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    /s/
       Samuel Raymond/Maurene Comey
       Allison Nichols/Jacqueline Kelly
       Assistant United States Attorneys
       (212) 637-6519

Cc:  Jill Shellow, Esq. (by ECF)